WILLIAM CHETWOOD v. STEPHEN P. BRITTAN.

It is not competent to show by parol, that at the time of executing a bond, the obligee agreed that the obligor should not be personally liable, but that the obligee would look to the mortgage security for payment.

BILL for a perpetual injunction, to restrain the defendant from proceeding at law to recover the balance due upon a bond given by the complainant to the defendant. The bond was secured by a mortgage of even date upon real estate. The mortgage had been foreclosed, and the mortgage security proving inadequate, the defendant commenced a suit at law against the complainant to recover the balance due upon his bond. The ground of relief disclosed in the bill is, that at the time of executing the bond, it was agreed that the obligor should not be personally responsible for the debt, the obligee declaring that the obligor need be under no apprehension of trouble or difficulty as to liability, as he (the obligee) would take the land, or look to the land, at any time for the balance of the consideration money; upon which assurance the complainant was induced to sign the bond and mortgage.

The answer denies the agreement charged in the bill, and also denies that the bond and mortgage were delivered on any terms, or conditions inconsistent with the absolute delivery thereof.

Upon filing the bill an injunction issued. The defendant having filed his answer, applied to dissolve the injunction, at July term, eighteen hundred and forty-one. The motion was denied, and the injunction continued to the final hearing.[*]

The cause came on for final hearing at a special term, at Newark, on the twenty-third day of May, eighteen hundred and forty-three, upon bill, answer, replication and proofs.

W. Chetwood and O. S. Halsted, for complainant.

A. Whitehead and I. H. Williamson, for defendant.

[*] See ante, vol. i. page 438.

[Chetwood v. Brittan.]

Cases cited on the part of the complainant. 3 *Starkie's Ev.*
1014; 1 *Ibid,* 306, 7, *note;* 1 *Esp.* 357; 1 *Peake,* 64; *Phil.*
*Ev.* 356, 7; 1 *John. Cas.* 153; 4 *Cranch,* 219, 222; 2 *Salk.*
444; 3 *Atkyns,* 388; 1 *Wilson,* 313; 1 *Dallas,* 424; 2 *Dallas,* 171; 4 *Dallas,* 340; 6 *Mass.* 492; 6 *John.* 110; *Coxe,*
86, 178; 4 *Hals.* 144; *Saxton,* 356; 1 *Mad. Prac.* 205, 213;
1 *Com. on Con.* 36, 37; 1 *Bro. Chan. C.* 54; 2 *Vesey, sen.*
380; 1 *Vern.* 296; 3 *John.* 528, 530; 2 *John. Chan.* 416.

Cases cited on the part of the defendant. 2 *Wilson,* 275;
*Cas. in Chan.* 20, 29; 1 *Vesey,* 241; 5 *Eng. Com. Law,* 268;
1 *Bro. Chan. C.* 92; 2 *Ibid,* 219; 4 *Ibid,* 514; 4 *Taun.* 783;
7 *Vesey,* 211; *Grisley's Eq. Ev.* 206; 1 *John. Chan.* 279, 425;
1 *Peters,* 598; 3 *Harr.* 506; *Swift's Ev.* 153, 149; 6 *Wendell,* 277; 2 *John. Chan.* 557; *Greenl. Ev.* 315; 11 *Mass.*
30; 2 *W. Blac.* 1249; 3 *Barn. and Ald.* 233; 1 *Mass.* 244;
8 *Mass.* 146.

THE CHANCELLOR. This case has been partially consider-
ed on a former occasion. It was on the motion to dissolve the
injunction. On that motion the injunction was continued until
the hearing, that an opportunity might be afforded better to get
at the true merits of the controversy. The parties have now
brought the cause to a final hearing on the merits, and it must
be disposed of.

The facts are few. Mr. Middlebrook agreed with the defend-
ant, in the year eighteen hundred and thirty-six, to purchase
of him a piece of land in the township of Elizabeth, in the
county of Essex, containing about twenty-seven acres, at two
hundred and seventy-five dollars an acre. In the purchase of
this land, or twenty-four acres of it, the complainant became
interested with Middlebrook. Before, however, the deed was
given, Middlebrook, with the consent of complainant, sold out
the twenty-four acres to a company got up by captain Wil-
liamson, at a considerable advance. This company prevailed
on the complainant to take the deed for the land, to hold in

trust for the several shareholders. The deed was accordingly made to him, and he gave his bond and mortgage to the defendant, for the sum which it had been agreed should be secured on the land itself. At this time, the idea that the land would ever fail to pay off the incumbrance, never entered into the head of any body. It was when the land mania prevailed in its wildest form. Things have resulted otherwise, the land has been sold under the mortgage, and has left a very considerable sum unpaid on the bond. The defendant prosecuted the complainant at law on this bond for such deficiency, and an injunction was ordered, restraining further proceedings in that action. That injunction is now asked to be made perpetual.

The allegation of the complainant, and on which the whole case turns, is, that at the time the bond and mortgage were executed, before signing the bond, the complainant expressed his unwillingness to become bound for the debt of others, when the defendant said, he need be under no apprehension on that score, " as he would take the land, or look to the land at any time for the balance due on the bond." It is upon this ground, this declaration made by the defendant at the time the papers were executed, that the complainant insists upon his right to be discharged from the payment of his obligation.

The competency of this evidence has always embarrassed the complainant's cause. Is it any thing short of allowing a witness, when a party signs and seals a bond promising to pay so much money, to contradict the paper, by testifying that it was agreed at that very time that the money was never to be paid, but that the obligee should take the land contained in the mortgage in payment? The writing says, the obligor is to pay in money ; the witness says, he was not to pay at all, but the land contained in the mortgage was alone to be looked to. What security can the public have in writings and seals, if they may thus be set aside by the breath of witnesses?

It will be observed, this is not a case of fraud, or mistake, or circumvention. The bond was given as agreed, and there is nothing about the transaction different from what was designed.

The defendant says he was to be paid in money, and shows as evidence the bond of the complainant, fairly given. The complainant then strives to defeat the recovery, by showing by parol that he was not to pay it, and that by a verbal agreement made, not at a subsequent day, but at that very time, the obligee agreed to look to the land alone. If this is not contradicting a written agreement, and under seal too, by parol, then I do not know any case in which it can be done.

Too much latitude has already been given, I fear, for the good of society, in allowing parol proof in explanation of written agreements; but no case, as it appears to me, has yet gone as far as I am asked to go in this. The authorities on the subject have been reviewed heretofore, and need not be again examined. In cases of trust, I am aware, parol evidence has been admitted to show who are the persons beneficially interested. It is a rule adopted to meet the necessity of that case. So a deed absolute on its face, may be shown to have been delivered as an *escrow*. This, however, does not affect the writing, but its delivery only. Nor will it do to be guided by those decisions where courts of equity, on a bill for a specific performance, have indulged defendants in parol proof in excuse for not fulfilling written contracts. Here a latitude has been given which belongs to no other case. The same proof will not be allowed the complainants in those very actions.

I must, therefore, be understood as entertaining a strong conviction against the competency of the evidence offered by the complainant, and adhering to the views heretofore expressed in my opinion on this subject; but I am disposed, under the peculiar circumstances of this case, and especially so as I may be mistaken upon the question of evidence, to look into the merits of the controversy.

The bill charges (and it being an injunction bill, is under oath) that the defendant told the complainant at the time, and before signing the bond, that he need be under no apprehensions of trouble or difficulty as to liability, " as he would take the land or look to the land at any time, for the balance of the consider-

29

ation money." The answer meets this charge "by denying unequivocally, and without any qualification, that the said bond and mortgage were delivered on any terms or conditions inconsistent with the absolute delivery thereof." It is further admitted, however, in the answer, that after the papers were executed, and at the time they were exchanged, the complainant said in a pleasant way, that he hoped the defendant would look to the land first, before calling on him for the bond, which the defendant agreed to do. Thus the statements in the bill and the answer are entirely different. The evidence mainly relied on, is that of Mr. F. B. C., the only person present at the time of executing the papers, and the witness on the bond. He alone can prove what took place at the time. He is a gentleman in whom great reliance may be placed, and he has evidently, in this case, felt the peculiarity of his position, and spoken with commendable caution. He does not profess to give the words used, but the ideas only. This is the statement he makes: "My father made objections to giving his bond to make himself responsible for the debt of others, for he had no interest at all in the matter; Mr. Brittan replied, in substance, that he need not be afraid to execute the bond on that account, he would take the land at any time for the balance of the debt; my father executed the bond then and the papers were exchanged." This is the length and breadth of the whole case, and no doubt honestly and fairly related. Was it anything more than a passing remark of the defendant, made to show (and truly at the time) his confidence in the value of the land? Did he really intend by that observation to absolve the complainant from all liability to him on his bond? If so, why execute the bond at all? It was not necessary to create a lien on the land; that might as well have been done by a mortgage alone, without the bond. Beside, it is out of the ordinary course of business, to sell land and have no person as bondsman or paymaster, and if it was designed to absolve the complainant from any obligation whatever, it is reasonable to suppose that the defendant would have insisted on a bond from the persons beneficially in-

[Chetwood v. Brittan.]

terested in the purchase.   To conclude that the parties intended to discharge the complainant from all personal responsibility, and yet take his bond, and that too without reducing such stipulation to writing, or preserving any further proof of it than the observation thus incidentally made by the defendant, is against all the notions I entertain of the course of business between man and man.   If intended as anything more than a passing remark, or designed to discharge the complainant from all liability on the instrument he was executing, it is reasonable to suppose some endorsement to that affect would have been made on the bond at the time.   It is not sufficient that the expression was calculated to encourage the complainant to place his signature to the bond; it is necessary to go further, and to be satisfied that it was intended by the parties, and so understood by the defendant in particular, at the time, as a settled agreement, that in no event should the complainant be called on to pay his bond, but the land alone should be resorted to.

My idea is, that the conversation between these parties was a casual one, expressive of the confidence the defendant had in the value of the land, without designing to alter or vary the legal obligations the parties were then entering into.   This proof, it will be seen, varies somewhat from the charge in the bill.   The charge is, that the defendant said he would take the land or look to the land for the debt.   The evidence is, that he said he would take the land for the debt; the difference is, perhaps, not material, but the proof is not as strong as the charge in the bill.   It appears from Mr. Chetwood's evidence, further, that the defendant said there was no danger of the land coming back to him ; that it was worth a great deal more than the incumbrance of the mortgage, after so much had been paid on it.   This is the most direct part of the evidence, but it is not all.   Isaac Coles testifies that the defendant, when asked why he foreclosed on the complainant, who was a responsible man, answered, as he understood him, that he was not personally responsible, but was only a stake-holder; that several others were engaged in it; it was a speculation concern, and he looked to

[Chetwood v. Brittan.]

others for payment. This evidence amounts to nothing more, when fairly considered, than the facts of the case fully warrant, that the complainant was acting for others, and the debt belonged to them to pay. The evidence of all the witnesses, of Mr. Bryant, Mr. Middlebrook, Mr. Crane and others, show that the complainant was known not to be interested in this transaction, personally, and great pains seem to have been taken by the defendant, to protect him from loss by securing his money from those who were really, in honor and justice, bound to pay it.

The fact that while the present bond and mortgage was outstanding, the defendant borrowed one thousand dollars of complainant and gave him his note for it, furnishes no proof that the defendant did not mean to collect this bond. The parties were friends, in habits of intimacy, and no doubt the defendant never designed to call on complainant but in the last extremity. The whole case shows this; men often enter upon fresh contracts, without intending to blend them with those then pending between them; and it appears that at the very time of loaning the one thousand dollars to the defendant, he held the joint note of complainant and his son, for five or six hundred dollars, which it is not pretended was affected by the new loan, nor designed so to be.

There is a view of this case which must not be passed by. If it was a fixed agreement that the defendant was at any time to take the land for his pay, it was surely requisite that the complainant should retain the land for that purpose. But this he did not do, nor could he, within the contemplated arrangement of the parties. The land had been sold out into shares, (according to the fashion of the day,) and every one of the share-holders became interested in and were part owners of the land. Accordingly, we find the complainant, a few days after the date of his deed from the defendant, executed to two of the share-holders a scrip for their shares; under his hand and seal, reciting the interest they severally had in the land, the amount paid and secured to be paid by them, and declaring

that he held the property in trust for them and others interested, and to be disposed of as they should direct. This writing, as it appears to me, is incompatible with the idea of returning the land to the defendant for the face of the bond. The complainant's power over it, after the issuing such a scrip, was gone. The two scrips above stated, are the only ones exhibited, but like scrips were given to the other share-holders. Nor can the evidence of Mr. Middlebrook be reconciled with the idea that the complainant was not to be called on for payment of the bond. He says, that when he and captain Williamson first called on the complainant to take the deed for the property, he objected to it, and was not willing to give his bond and mortgage; but they told him there was no danger, that the property was safe for the money, when he agreed to take the title and to give his bond and mortgage. This witness further says, that he was absent for some time and returned before the mortgage was foreclosed, and had a number of conversations with the complainant, who expressed his fears that he had got in difficulty by taking the title for the property, and that in case of loss, the witness, who was interested in the original purchase, ought to bear his proportion. The complainant, he says, never, in any of these conversations, set up that he was not personally responsible on the bond to the defendant, but always insisted that the share-holders ought, in justice, to come forward and pay it. The witness went so far as to offer his services to complainant, to get a paper signed by the share-holders, stipulating, upon receiving a deed for their shares, to comply with their purchase, and thus relieve him, and he actually got one signed by four of them, which paper is marked an exhibit in the cause. This paper was shown to the complainant, who declared he could not portion off the shares in that way, and said there ought to have been a bond of indemnity. All this is incompatible with anything short of the complainant's liability; that the complainant was a trustee, and only a trustee for others in this land, is certainly true, but he consented to take a title, and to give his own bond and mortgage to the defendant, and as be-

29*

[Chetwood v. Brittan.]

tween him and the defendant therefore, it became a personal obligation. The arrangement by which the title passed to the complainant, was made between the complainant and those who purchased the land ; the defendant had no part in it, except when it was suggested to him, he agreed to it. The shareholders should unquestionably pay this money ultimately, but the defendant, by accepting the bond of the complainant, has effectually shut himself out from any resort to them. The remedy on his part is only against the complainant, and he must resort to those in whose behalf he has interposed his responsibility.

The case is a hard one upon the complainant, and I would cheerfully have availed myself of any equitable principle for his relief, but I have not been able to satisfy myself that he has made out such a case as will justify the further interference of this court. He stands in the position of surety for others, a position which he imprudently and yet voluntarily assumed.

I cannot but view this case, and the developments made in it, as furnishing ample evidence of the wisdom of that rule of law, which forbids any proof from witnesses contradicting the writing itself, if spoken at the time of its execution ; and most certainly, if such proof is admitted, it should leave no doubt when produced, that the conversation was designed by all the parties, to make the contract in its legal operation, different from that stated in the writing.

The bill must therefore be dismissed, with costs.*

---

* This decree was unanimously affirmed in the court of errors and appeals, at April term, eighteen hundred and forty-six.